*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-FM-490

ISELA RAMIREZ, APPELLANT,

v.

ALFREDO SALVATERRA, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(CPO-1015-14)

(Hon. Maribeth Raffinan, Trial Judge)

(Argued January 31, 2019                    Decided July 23, 2020)

*Robert Ziff*, with whom *Warren T. Allen II*, *Nicole Grimm*, *Elizabeth Malone*, and *Donald P. Salzman* were on the brief, for appellant.

*Jennifer Williams*, Public Defender Service, with whom *Samia Fam*, Public Defender Service, was on the brief, for appellee.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and FISHER, *Associate Judges*.

Opinion for the court by *Chief Judge* BLACKBURNE-RIGSBY.

Opinion by *Associate Judge* GLICKMAN, dissenting in part and concurring in

the judgment, at page 48.

BLACKBURNE-RIGSBY, *Chief Judge*:   Appellant Isela Ramirez appeals the

trial court's partial denial of her motion for a one-year extension of her Civil Protection Order ("CPO").  The trial court issued the original CPO in 2014 based upon its finding that there was good cause to believe that appellee Alfredo Salvattera committed a criminal offense – misdemeanor sexual abuse or sexual contact – against Ms. Ramirez, and it extended the CPO in two one-year increments, once in 2015 and again in 2016.  In 2017, Ms. Ramirez moved for a third extension.  The trial court granted a temporary extension for the duration of proceedings and, in 2018, denied Ms. Ramirez's motion for another one-year extension, instead granting an extension for only three months.  On appeal, Ms. Ramirez contends that, in so doing, the trial court abused its discretion.

Today we clarify and elaborate upon the legal test, as articulated in our precedents, for extending a CPO.  Specifically, we hold that the trial court must conduct a two-part inquiry as follows.  First, the trial court must determine whether there is "good cause" to extend the CPO.  D.C. Code § 16-1005(d) (2012 Repl. & 2020 Supp.).  "Good cause" is defined as a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year if the CPO is not extended.  *See* D.C. Code § 16-1005(c), (d); *Cruz-Foster v. Foster*, 597 A.2d 927, 929-30 (D.C. 1991).  In making this determination, the court must evaluate the entire mosaic of the case, including the parties'

relationship and interactions both before and after the issuance of the CPO and any prior extension of the CPO, as well as the parties' current circumstances. If the trial court finds such good cause, it may extend the CPO; if it does not find such good cause, it may not extend the CPO. Second, if the trial court has found good cause, it must balance the harms to each party that may result from the extension or the lack thereof to determine whether to, in fact, extend the CPO. This balancing will also inform the scope and parameters of the extension, including the duration and conditions of the extended CPO. We review the trial court's decision for abuse of discretion.

Having clarified this standard, and, cognizant of the fact that more than two years have elapsed since Ms. Ramirez last moved to extend the CPO, we vacate the trial court's order and remand for further proceedings so that the trial court may consider the current circumstances of the case with the benefit of this opinion.

## I. Factual and Procedural Background

This case has a long and complex history, which is summarized below for clarity.

## A. The 2014 CPO

On March 28, 2014, Ms. Ramirez filed a petition for a CPO, alleging that Mr. Salvattera sexually assaulted her in October 2013. At a nine-day hearing held before Judge Fern Flanagan Saddler from May to July 2014, the trial court heard testimony from Ms. Ramirez, as well as from a Sexual Assault Nurse Examiner ("SANE nurse") who testified generally about sexual assault; a SANE nurse who examined Ms. Ramirez in October 2013; an employee at a nutrition center that Ms. Ramirez frequented; Ms. Ramirez's sister; and an investigator for the Public Defender Service ("PDS") (which represented Mr. Salvattera). The court found the following facts.

Since September 2001, Ms. Ramirez had lived in a third-floor unit of an apartment building in Northwest Washington, D.C. with her children, and, for a time, her father. At the time of the 2014 hearing, Ms. Ramirez was thirty-one years old and worked at an herbal medicine store. During the period relevant to the CPO petition, Mr. Salvattera lived in a first-floor unit of the same building, where he acted as a building manager. Before the events that gave rise to the petition, Ms. Ramirez had visited Mr. Salvattera's apartment several times to discuss rent. During one visit by Mr. Salvattera to Ms. Ramirez's apartment in

order to do some work, he told her that he wanted to hug her and that he had dreamed about her wearing a red dress.

On October 26, 2013, Mr. Salvattera sent Ms. Ramirez a text message stating that he wanted to discuss the rent with her father. On October 28, Ms. Ramirez went to Mr. Salvattera's apartment around 10:00 p.m. to discuss rent with him, first knocking on his door and then on his window to be let in. She stayed at Mr. Salvattera's apartment for about an hour discussing rent. During this time, he showed her a picture that he had taken of her by the trash can outside the apartment building. Ms. Ramirez had been concerned about eviction, and, when they discussed it, Mr. Salvattera said that she could be out on the street at any time. Ms. Ramirez had had two beers with dinner earlier in the evening; while she was at Mr. Salvattera's apartment, he offered her sangria and she drank three glasses. She did not see him pour the third glass. Five minutes after she took a sip of it, she had a stomachache and vomited blood. She remembered nothing until she woke up in Mr. Salvattera's bed, naked from the waist down. When she asked Mr. Salvattera what happened, he said that they took their clothes off and "what had to happen happened." Ms. Ramirez began to yell and cry, and she said that she would call the police. Mr. Salvattera denied doing anything and told her to get out. Ms. Ramirez left the apartment. On October 29, she went to a clinic and then a

hospital. At the hospital, she was examined by a SANE nurse and spoke to a detective; Ms. Ramirez reported no pain or injury to the SANE nurse, other than pain in her chest, and the SANE nurse found no forensic evidence of sexual assault.

Prior to the October 2013 incident, Ms. Ramirez had experienced anxiety and panic attacks, had taken medication for anxiety, and had a history of vomiting and bleeding. After the incident, she began to experience anxiety, panic, and fear, particularly when she passed Mr. Salvattera's apartment on her way in and out of the building. She frequently saw Mr. Salvattera in and around the building after the October 2013 incident, but no additional incidents occurred.

On August 26, 2014, at the conclusion of the hearing, Judge Saddler found good cause to believe that Mr. Salvattera committed a criminal offense, finding by a preponderance of the evidence that he committed misdemeanor sexual abuse or sexual contact against Ms. Ramirez.[1] The judge issued a CPO for one year, which

---

[1] *See* D.C. Code § 22-3006 ("Misdemeanor sexual abuse") (2012 Repl. & 2020 Supp.); *see also* D.C. Code § 22-3001(9) (2012 Repl.) ("Definitions" (defining "sexual contact")).

The trial judge stated that Mr. Salvattera committed an "intrafamily offense." Under D.C. Code § 16-1001(6)-(9) (2012 Repl.), a criminal offense only

(…continued)

ordered Mr. Salvattera to refrain from assaulting, threatening, or harassing Ms. Ramirez; to stay 100 feet away from Ms. Ramirez, and to vacate the apartment building by September 12, 2014.

## B. The 2014-2015 Appeal

Mr. Salvattera appealed and filed an emergency motion for a stay pending appeal of the provision of the CPO requiring him to vacate the apartment building, arguing that the trial court lacked the authority to order him to do so, given that he lived in a separate unit and did not share a residence with Ms. Ramirez. This court granted an administrative stay of the vacate provision from the date the CPO was entered; the court then held oral argument on the emergency motion, and, on December 15, 2014, granted a stay of the vacate provision pending appeal (leaving the remainder of the CPO in place). *Salvattera v. Ramirez*, 105 A.3d 1003, 1009 (D.C. 2014) ("*Salvattera I*"). On March 26, 2015, this court decided the appeal,

---

(…continued)
qualifies as an intrafamily offense if it was committed against a person to whom the offender is or was related through blood; adoption; legal custody; marriage; divorce; domestic partnership; sharing a residence; a romantic, dating, or sexual relationship; or with whom the respondent has a child in common. Because Ms. Ramirez and Mr. Salvattera were not related in any of these ways, the offense was not an intrafamily offense. However, sexual abuse is a predicate offense under the IntraFamily Offenses Act pursuant to § 16-1001(12). See *infra* note 8.

rejecting Mr. Salvattera's challenge, lifting the stay, and affirming the entirety of the CPO. *Salvattera v. Ramirez*, 111 A.3d 1032, 1034-38 (D.C. 2015) ("*Salvattera II*").[2]  On remand, the trial court ordered Mr. Salvattera to vacate the apartment building by June 9, 2015.

## C. The 2015 CPO Extension

In August 2015, Ms. Ramirez moved to extend the CPO.  Judge Marisa J. Demeo presided over a three-day evidentiary hearing, during which she heard testimony from Ms. Ramirez, Mr. Salvattera, and a PDS investigator.  She found that there were two incidents in which Ms. Ramirez and Mr. Salvattera had encountered each other since the CPO had been issued – both of which occurred before the vacate provision of the CPO was enforced.  On May 19, 2015, Ms. Ramirez was waiting at a bus stop in her neighborhood when Mr. Salvattera drove by in his car; he saw her and promptly drove away.  Then, on June 1, 2015, Mr. Salvattera was carrying a board up the stairs of the apartment building, saw Ms. Ramirez, and laughed at her in a "mocking" way, which made her feel "scared and

---

[2]  This court also rejected Mr. Salvattera's challenge to the sufficiency of the evidence and his contention that the trial court improperly balanced the harms to the parties. *Salvattera II*, 111 A.3d at 1037-38.

horrified." The judge did not find these incidents to rise to the level of CPO violations or to merit findings of contempt.

Judge Demeo also considered the "entire mosaic" of the parties' relationship and history, including what occurred prior to the October 29, 2013 incident. She found that Mr. Salvattera had lived in the building since 2010, and that Ms. Ramirez had visited his unit several times, including to sell him products, and to borrow money. Ms. Ramirez had also taken two female friends on two different occasions to Mr. Salvattera's apartment to ask for work and money for them; Ms. Ramirez felt that Mr. Salvattera was inappropriately romantic with both of them. In addition, Ms. Ramirez had been to Mr. Salvattera's apartment for social visits, including talking with him about marital issues with her husband, bringing her kids over for pizza, and coming over wearing a wig, at which point Mr. Salvattera asked to take a picture of her and she agreed. The judge found that there was an "uneven power dynamic" between the parties because Mr. Salvattera was a building manager and handyman, spoke both Spanish and English, and helped tenants with translations and applications for public benefits, whereas Ms. Ramirez did not speak English, was not educated, was not then working, lived in the worst unit in

the building, and had landlord/tenant issues with building owner.[3]

The trial court also examined the current status of the parties. It found that Ms. Ramirez had had panic attacks and trouble sleeping prior to the October 2013 incident, and she continued to have these issues after that incident, including panic attacks when she would see Mr. Salvattera. The court found that Ms. Ramirez feared seeing Mr. Salvattera in the building, and that, when she would see him, she would "remember everything that happened to [her]" during the October 2013 incident. The court further found that Ms. Ramirez no longer felt safe since her father moved out of her apartment in 2014. She left her apartment and stayed in shelters and with friends for about a year (from March 2014 to April 2015), and only moved back after the vacate provision of the CPO took effect. With respect to Mr. Salvattera, the court found that, prior to the October 2013 incident, he lived rent-free due to his role as a building manager, handyman, and liaison between the tenants and the landlord, but that he had become homeless, jobless, and experienced economic hardship since vacating his apartment pursuant to the CPO (for instance, he had only $9 at the time of the hearing).

---

[3] Judge Demeo did not address Judge Saddler's previous finding that Ms. Ramirez had worked at an herbal medicine store.

Based on these findings, the court concluded that, even though there had been no violations of the CPO provisions, there was a cognizable danger of a recurrent violation based on the October 2013 criminal offense, the laughing incident, and the fact that, without the vacate provision of the CPO in place, the parties would routinely encounter each other in the apartment building. The court then balanced the potential harms to the parties, concluding that – even though Mr. Salvattera was not a person of considerable means and even though the CPO had caused (and would continue to cause) significant harm to Mr. Salvattera's living situation and financial stability – the harm to Ms. Ramirez from not extending the CPO would be greater because she was in a more disadvantaged position than him, had children, and would have to leave her apartment if he were permitted to return to the building. Thus, on October 22, 2015, the trial court concluded that good cause existed to extend the CPO and issued a one-year extension.

### D. The 2016 CPO Extension

In October 2016, Ms. Ramirez moved for a second one-year extension of the CPO. The parties again appeared before Judge Saddler, who conducted a one-day evidentiary hearing, involving testimony from Ms. Ramirez and Mr. Salvattera, and concluded that there was good cause to extend the CPO. The trial court

considered the "entire mosaic" of the case, but did not address the danger of a recurrent violation, noting only that there was one instance in the preceding year when Mr. Salvattera saw Ms. Ramirez in the neighborhood, but he was in his car and drove away when he saw her. The court appeared to base its decision largely on its balancing of the harms. It found that Ms. Ramirez still felt "fear and horror" toward Mr. Salvattera and would not have "peace of mind," as she would "relive what happened" every time she saw him – something that would occur if Mr. Salvattera moved back into the building, despite his commitment to avoid Ms. Ramirez as much as possible. It also found that Mr. Salvattera had lived several places since vacating the apartment building and was then staying in an apartment half a mile away, was doing odd jobs to make money, and had been recently diagnosed with diabetes. It then concluded that Ms. Ramirez had "met her burden of proof" and granted the one-year extension of the CPO, effective December 5, 2016.[4]

**E. The 2018 CPO Extension**

---

[4] Mr. Salvattera appealed the December 5, 2016 order extending the CPO for one year, but then voluntarily dismissed the appeal as moot when the trial court issued the March 20, 2018 order that is the subject of this appeal, discussed below.

Finally, on December 1, 2017, Ms. Ramirez filed a third motion to extend the CPO for one year. Judge Maribeth Raffinan temporarily extended the CPO pending further proceedings, held a two-day evidentiary hearing in February 2018, at which both parties testified, and issued a written order on March 20, 2018.

In her written order, Judge Raffinan reviewed the entire history of the case, including the original CPO and subsequent extensions. She then made several factual findings regarding what had occurred since December 5, 2016, when the CPO was last extended. Specifically, the trial court found that, although Mr. Salvattera had not contacted Ms. Ramirez in any way, the parties had encountered each other twice in the neighborhood. On December 5, 2017, Ms. Ramirez saw Mr. Salvattera standing across the street from a bus stop and talking to someone. Ms. Ramirez hid behind a taxi, called 911, and began taking pictures of him; when Mr. Salvattera realized someone across the street was photographing him, he assumed it was her, got in his car, and drove away immediately. On February 13, 2018, Mr. Salvattera was with a friend at a McDonald's restaurant, saw Ms. Ramirez there, and left immediately. On both occasions, Ms. Ramirez felt "scared"; during the bus stop incident, she also felt "panicky" and "began to relive everything that had happened to her." Judge Raffinan concluded that the evidence showed that Mr. Salvattera did not violate the CPO or otherwise harass Ms.

Ramirez because his immediate response to each encounter was to leave as soon as possible.[5]

The trial court also made factual findings regarding the parties' changed circumstances since the last CPO extension. While there was no material change to Ms. Ramirez's circumstances, Mr. Salvattera was then living in a room in someone else's home in exchange for a friend staying in Mr. Salvattera's former unit in the apartment building, as the vacate provision of the CPO was still in effect. In his new location, Mr. Salvattera had access to a bedroom and bathroom, but not to the common areas of the home, including the kitchen. Mr. Salvattera's health had worsened due to his diabetes, as his vision had become impaired and he could no longer stand for more than four or five hours, both of which made it difficult to perform his work as a handyman – and his lack of access to a kitchen

---

[5] The trial court noted that the CPO "does not prohibit [Mr. Salvattera] from engaging in everyday activities within his neighborhood, so long as he does not violate the specific provisions of the CPO," and further observed: "While [Mr. Salvattera] admitted that he had seen [Ms. Ramirez] at this McDonald's previously . . . [Mr. Salvattera] must stay 100 feet away from the [Ms. Ramirez's] person – not every location where [Mr. Salvattera] has seen [Ms. Ramirez] before." The court further noted that, on September 18, 2017, Ms. Ramirez saw Mr. Salvattera's car parked on the street and took pictures of it, but he was not there. Additionally, Ms. Ramirez presented photos showing that Mr. Salvattera still receives mail at the apartment building, but the trial court credited his testimony that, although he did not live in the building anymore, he still received mail there and his friend who lived in the building brought him his mail.

made proper nutrition difficult.

The court noted explicitly that it was considering the "entire mosaic" of the parties' relationship and the history of the case, examining in detail the factual findings from the prior proceedings and the current proceedings. It also reviewed this court's case law on CPO extensions, concluding that it must consider both whether there is a cognizable danger of future abuse and the potential harms to the parties in determining whether there is good cause to extend a CPO. It then applied the law to the facts to determine whether to extend the CPO again.

First, the court found that there was no cognizable danger of a recurrent violation because (1) the parties had no history of violence or harassment before the October 2013 incident; (2) the October 2013 incident occurred four and half years prior; (3) no incidents occurred between October 2013 and March 2014, while the parties were living in the same building; (4) the June 2015 laughing incident occurred almost three years prior to the current proceedings; (5) Mr. Ramirez had not targeted or harassed Ms. Ramirez in any way since June 2015; and (6) Mr. Ramirez had not called, texted, or otherwise contacted Ms. Ramirez. Although the trial court credited Ms. Ramirez's testimony that she was "terrified" of Mr. Salvattera, it stated that "this does not provide evidence that [Mr.

Salvattera] has committed or is likely to commit additional abuse against her; it only indicates that [Ms. Ramirez] continues to be affected by past abuse."

The court then balanced the harms to the parties. It recognized the harm to Ms. Ramirez that would result if the CPO were not extended, given her fear of Mr. Salvattera and her reliving of what happened to her when she sees him. On this point, it stated that our precedents have noted the importance of the petitioner's "peace of mind," and that "Ms. Ramirez's mental health and well-being is a serious concern, worthy of careful consideration." However, the trial court also recognized the harm to Mr. Salvattera if the CPO were extended for another year, given that he had been out of his home for almost three years and unable to work steadily during that time (because he could no longer work as a property manager at the apartment building), instead working odd jobs to make money. The court further found that a "power imbalance" no longer existed, as Mr. Salvattera's economic situation had worsened, he had developed significant health problems, and he would have nothing to do with managing Ms. Ramirez's unit even if he were to return to the apartment building – meaning "the parties [were] on much more equal footing." It therefore found that the harm to Mr. Salvattera that would result from extending the CPO outweighed the harm to Ms. Ramirez that would result from not extending the CPO.

Based on its conclusion that there was no danger of a recurrent violation or abuse and that the balance of the harms favored Mr. Salvattera, the court found that there was no good cause to extend the CPO for one year. However, recognizing that immediate termination of the CPO provisions might cause Ms. Ramirez distress and that she may need time to determine whether to move out of the apartment building, the court concluded that there was good cause to grant a "brief" three-month extension of the CPO. It therefore extended the CPO for only three months.

Ms. Ramirez timely appealed. The trial court denied her motion for a partial stay pending appeal. However, this court entered an administrative stay pending appeal, then vacated the administrative stay and granted Ms. Ramirez's motion for a stay of the expiration provisions of the March 20, 2018 CPO, ordering that the CPO shall remain in effect pending further order of this court.

## II. Legal Standard

Over the years, this court has issued three decisions interpreting the legal standard applicable to extending a CPO for "good cause" under D.C. Code § 16-

1005(d). As demonstrated by the record and the briefing in this case, confusion persists regarding the principles articulated in those cases, and, as a result, regarding the contours, content, and application of that standard.[6] We therefore take this opportunity to examine the relevant statutory language and case law, and, based on these authorities, to clarify the applicable legal standard in this case and for future cases.

**A. The Intrafamily Offenses Act**

The Intrafamily Offenses Act ("the Act"), D.C. Code §§ 16-1001–1006, was passed by Congress in 1970 in order to create a civil mechanism for addressing violence within families – an "imaginative and progressive" system that was designed to promote "prevention and treatment" over punishment. *United States v. Harrison*, 461 F.2d 1209, 1210-11 & n.2 (D.C. Cir 1972) (citations omitted). In giving the courts of the District of Columbia "a wider range of dispositional powers than criminal courts," including the power to issue CPOs that enjoin future actions and provide for counseling and mental health treatment, *id.*, the Act was

---

[6] This confusion is also apparent in the dissent's assertion, however well-meaning, that our cases allow for a nebulous inquiry in which the injunctive nature of a CPO is irrelevant and no legal framework is necessary. *Post* 69-72.

designed both to "protect victims of family abuse from acts and threats of violence," *Cruz-Foster*, 597 A.2d at 929, and to "effect rehabilitation rather than retribution" or "punish[ment]" of civil offenders. *Harrison*, 461 F.2d at 1210-11. The Act should therefore be liberally construed in furtherance of its remedial purposes. *Id.* at 1210; *Cruz-Foster*, 597 A.2d at 929.[7]

The Act seeks to prevent and remediate particular criminal offenses: intrafamily, interpersonal, and intimate partner violence, as well as stalking, sexual assault, and sexual abuse. D.C. Code §§ 16-1001(6)-(9), (12), 16-1005(c).[8] To

---

[7] In focusing only on the remedial purpose of protecting and rehabilitating petitioners, while ignoring or minimizing the other stated remedial purpose of rehabilitating (rather than punishing) respondents, the dissent – not this opinion – "read[s] into the Act limitations or restrictions which [the Act] does not contain." See *post* at 53-62, 71.

[8] As originally passed, D.C. Code § 16-1001 defined an "intrafamily offense" as a criminal offense committed between family members or those who share(d) a mutual residence. District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, 84 Stat. 473, 546-47 (1970). In 1994, the Council of the District of Columbia ("Council") broadened the definition of "intrafamily offense" to also include criminal offenses committed between those who have or had a romantic relationship. Domestic Violence in Romantic Relationships Act of 1994, D.C. Law 10-237, § 2, 42 D.C. Reg. 36-37 (Dec. 27, 1994).

In 2009, the Council again amended the Act, making extensive revisions to several sections. These changes included redefining "intrafamily offense" in § 16-1001 to mean "interpersonal, intimate partner, or intrafamily violence," and adding definitions of each of these terms ("interpersonal violence," "intimate partner

(…continued)

this end, it provides that a trial court "may issue" a CPO that is effective for "up to one year," if it "finds that there is good cause to believe the respondent committed or threatened to commit a criminal offense against the petitioner." § 16-1005(c), (d). The CPO may include a range of remedial provisions, including protective and rehabilitative measures, both mandatory and prohibitory, applicable to the petitioner and the respondent, as appropriate. § 16-1005(c)(1)-(12). Consistent with the standards generally applicable to civil cases, a finding of good cause to issue a CPO must be supported by a preponderance of the evidence, and it is the

(…continued)
violence," and "intrafamily violence") to § 16-1001; adding "petitioner" and "respondent" to the definitions included in § 16-1001; defining a petitioner as any person who alleges that he or she was the victim of "interpersonal, intimate partner, or intrafamily violence, stalking, sexual assault, or sexual abuse"; and modifying the language of § 16-1005(c) to allow a trial court to issue a CPO upon a finding of good cause that a respondent has committed or threatened to commit "a criminal offense" against a "petitioner." Intrafamily Offenses Act of 2008, D.C. Law 17-368, § 3, 56 D.C. Reg. 1338-45 (Jan. 22, 2009). These revisions stemmed from the Council's recognition that the need for a CPO may "result[] from a relationship that is not, strictly speaking, intrafamily," such as a dating relationship. Council, Comm. on Public Safety & the Judiciary, "Report on Bill 17-55, the 'IntraFamily Offenses Act of 2008,'" at 2-3 (Nov. 25, 2008); *see also Richardson v. Easterling*, 878 A.2d 1212, 1217 n.6 (D.C. 2005) (noting that the legislative history of the Act indicates that the proponents recognized that domestic violence may include physical, sexual, or emotional violence, such as stalking).

Thus, under the Act as it now reads, a petitioner may obtain a CPO if a respondent has committed or threatened to commit a criminal offense against him or her – specifically interpersonal, intimate partner, or intrafamily violence, stalking, sexual assault, or sexual abuse. D.C. Code §§ 16-1001(12), -1003(a), 16-1005(c) (2012 Repl.) (2020 Supp.).

petitioner's burden to put forth this evidence. *See Salvattera II*, 111 A.3d at 1037 (citing *J.O. v. O.E.*, 100 A.3d 478, 481 (D.C. 2014)); *Cruz-Foster*, 597 A.2d at 930-31. The issuance of a CPO is within the broad discretion of the trial court, and this court will reverse the trial court's decision only where the trial court has abused its discretion. *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C. 1993); *see also Robinson v. Robinson*, 886 A.2d 78, 86-87 (D.C. 2005); *Cruz-Foster*, 597 A.2d at 931-32.

The Act also provides that, upon motion of any party, the trial court "may . . . extend, rescind, or modify the [CPO] for good cause shown." D.C. Code § 16-1005(d).[9] We have held that the same procedural features apply to extensions of CPOs that apply to the initial issuance of CPOs – meaning that the petitioner bears the burden of proof, the trial court must make a finding of good cause based on a preponderance of the evidence, and this court reviews the grant or denial of a CPO extension for abuse of discretion. *Robinson*, 886 A.2d at 87; *Maldonado*, 631 A.2d at 42; *Cruz-Foster*, 597 A.2d at 930 & n.3; *cf. Salvattera II*, 111 A.3d at 1037; *see also J.O.*, 100 A.3d at 481. The legal standard applicable to motions to

---

[9] The language of this subsection has not changed since the Act was first passed in 1970, except to substitute the term "judicial officer" for the term "Family Division." *Compare* District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. at 547, *with* D.C. Code § 16-1005(d).

extend CPOs, however, has been the subject of continued inquiry. This is, in part, because, while § 16-1005(c) defines "good cause" to issue a CPO in the first instance, § 16-1005(d) does not define "good cause" to extend a CPO. We have therefore sought, in our case law, to define the good cause determination necessary for extending a CPO and to articulate additional relevant considerations.

**B.** *Cruz-Foster*, *Maldonado*, **and** *Robinson*

In *Cruz-Foster v. Foster*, decided in 1991, we first noted the definitional gap in the IntraFamily Offenses Act, observing that "[t]he term 'good cause,'" as used in D.C. Code § 16-1005(d), "is not defined in the statute." *Cruz-Foster*, 597 A.2d at 929. Reasoning that a CPO is injunctive in nature, and that a petitioner seeking a CPO extension is seeking "an injunction which has not been previously granted," we defined good cause according to the standard for civil injunctive relief, as articulated by the Supreme Court:

> [T]he moving party must satisfy the court that relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. The chancellor's decision is based on all the circumstances; his discretion is necessarily broad and a strong showing of abuse must be made to reverse it. To be considered are the bona fides of the expressed intent to comply, the effectiveness of the discontinuance and, in

some cases, the character of the past violations.

*Id.* at 930 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). The dissent mistakenly posits that *Cruz-Foster*'s definition of "good cause" as a "cognizable danger of recurrent violation" was limited to its facts, *post* at 64-65 & n.28; however, the language of *Cruz-Foster* offers no support or indication that its holding can or should be interpreted in as narrow or restricted manner as the dissent suggests.[10]  The holding in *Cruz-Foster* explicitly fills a gap in the Act by defining "good cause" under § 16-1005(d), without caveat or qualification.  *See Cruz-Foster*, 597 A.2d 929-31.

As to the "character of the past violations," the *Cruz-Foster* court clarified that "the past history of the case is critical to the [good cause] determination" because a respondent's "past conduct is important evidence – perhaps the most important evidence – in predicting [the respondent's] probable future conduct"; the trial court therefore cannot only "examin[e] the most recent episode" in a case, but

---

[10]  We note that, while the dissent rejects one of *Cruz-Foster*'s central holdings – the definition of "good cause" under § 16-1005(d) – it takes no issue with *Cruz-Foster*'s other holdings, including the allocation of the burden to petitioner, the preponderance quantum of proof, the evaluation of the entire mosaic, and appellate review for abuse of discretion in CPO proceedings.  *Post* at 59-60, 66-67, 70-72; *see also Cruz-Foster*, 597 A.2d at 930-32.

"must be apprised of the entire mosaic" of the case. *Id.* at 930 (citations and internal quotation marks omitted).

We then held that, in addition to determining whether there is "good cause," i.e., a cognizable danger of a recurrent violation, the trial court must – in light of the remedial nature of the Act – consider whether the "balance of the harms" favors extending the CPO, taking into account the potential injury to the petitioner if the CPO is not extended and the potential injury to the respondent if the CPO is extended. *Id.* at 930-31.

Applying these considerations to the facts in *Cruz-Foster*, we held that the trial court abused its discretion in focusing only on the most recent episodes and in failing to consider the entire mosaic of the case – including the respondent's previous violation of the CPO, for which he was convicted of criminal contempt and imprisoned, as well as conditions of release in another criminal case that required the respondent to stay away from the petitioner – in its determination of whether there was good cause to extend the CPO, i.e., whether there was a danger of future abuse. *Id.* at 931-32. We therefore vacated and remanded for the trial court to reconsider and enter "more comprehensive findings of fact and conclusions of law." *Id.* at 932.

Two years later, in *Maldonado v. Maldonado*, we applied the logic, though not the terminology, of *Cruz-Foster*. We held that, in considering a motion to extend an existing CPO, the trial court abused its discretion in finding that there was no possibility that the respondent may commit a criminal offense against the petitioner in the coming year, i.e., no cognizable danger of a recurrent violation. *Maldonado*, 631 A.2d at 43. We concluded that, even though the respondent was incarcerated, there was a chance that he could be released from prison prior to the expiration of the requested one-year CPO extension, and, even if he remained in prison, it was possible for him to threaten or harass the petitioner by telephone, mail, or through third parties, as he had done in the past. *Id.* On this point, we noted that the CPO "serves as a potential deterrent [of future offenses] and provides a measure of peace of mind for those whose benefit it was issued." *Id.* We went on to note that the trial court did not consider the fact that the CPO granted child custody and child support payments to the petitioner, and that both would be jeopardized if the CPO were not extended – meaning it did not balance the potential harms to the parties. *Id.* at 43-44. Finally, the respondent had consented to the extension of the CPO, thereby rendering the foregoing analysis somewhat academic; we observed that the trial court did not explain its reasons for rejecting the respondent's consent, which also amounted to an abuse of discretion.

*Id.* at 44.  We therefore remanded.  *Id.*

In 2005, we decided *Robinson v. Robinson*, a case in which the parties were in the process of divorcing, the petitioner was still living in the marital home, and the petitioner obtained a modified CPO that ordered the respondent to stay 100 feet away from her – but also allowed him to live in the home next door to her (as both houses had been marital property).  *Robinson*, 886 A.2d at 81-84.  The trial court extended the modified CPO for one year, even though the houses were only ten to twelve feet apart.  *Id.* at 83-84.  We observed that the trial court's order "betrays a tension between its finding that potentially 'tragic violence' might occur between the parties and its decision to allow [the respondent] to live within twelve feet of [the petitioner]," and that "the Act clearly envisions allowing safety concerns to trump property rights."  *Id.* at 86.  We elaborated:

> Although ordering a person to vacate his or her home or denying the use of owned property is a serious step, not to be lightly undertaken, when the trial court finds that [criminal] offenses have been committed or are imminent, it can be a necessary measure to ensure peace and safety.

*Id.*  We concluded that the trial court abused its discretion because it did not rest its conclusion on correct legal principles, and we therefore remanded for the trial court to consider "the entire mosaic of facts" and the "broad remedial measures

available to safeguard [the petitioner's] safety and peace of mind." *Id.* at 87. Though we did not employ the precise nomenclature of *Cruz-Foster*, we again applied its reasoning: in essence, we held that the trial court had properly found a cognizable danger of a recurrent violation and therefore good cause to extend the CPO, but that it had improperly balanced the harms to the parties in that the provisions of the extended CPO did not adequately reflect the fact that safety concerns may trump property rights.[11]

## C. Applicable Legal Principles

From the statute and our case law, we can distill the following principles.

### 1. Good Cause

First, a CPO is a form of injunctive relief, designed to enjoin the commission of certain kinds of criminal offenses. *See Cruz-Foster*, 597 A.2d at 929-31. Indeed, we have stated that "[a] petition for a CPO is, in substance, a suit for a one-

---

[11] Both *Maldonado* and *Robinson* follow the logic of *Cruz-Foster*. The dissent's attempt to use *Maldonado* and *Robinson* to strip *Cruz-Foster* of its good cause holding is unpersuasive. *Post* at 67-69.

year injunction; the injunction may subsequently be extended." *Tyree v. Evans*, 728 A.2d 101, 104 (D.C. 1999); *see also Harrison*, 461 F.2d at 1211 ("[A] civil protection order . . . is in the nature of an injunction." (internal quotation marks omitted)); *Tyree*, 782 A.2d at 106 ("An injunction is an extraordinary remedy."). The purpose of a CPO is to enjoin conduct – here, a criminal offense or the threat of a criminal offense. If there is no appreciable risk that that conduct will occur, then there is no need to issue an injunction. This is because, in general, "a plaintiff seeking forward-looking relief, such as an injunction, must allege facts showing that the injunction is necessary to prevent injury otherwise likely to happen in the future," *Equal Rights Ctr. v. Props. Int'l*, 110 A.3d 599, 603 (D.C. 2015), and the IntraFamily Offenses Act in particular "is specifically aimed at preventing future injury," *Salvattera II*, 111 A.3d at 1037, as a CPO issued under the Act "serves as a potential deterrent [of future offenses] and provides a measure of peace of mind for those whose benefit it was issued." *Maldonado*, 631 A.2d at 43 (internal citation, quotation marks, and brackets omitted).

It is for this reason that, just as issuance of an initial CPO under § 16-1005(c) is based on "good cause to believe the respondent committed or threatened to commit a criminal offense against the petitioner," the extension of a CPO under § 16-1005(d) for "good cause" must mean good cause to believe that there is a

"cognizable danger of a recurrent violation," *Cruz-Foster*, 597 A.2d at 930, i.e., a cognizable danger that respondent will commit or threaten to commit a criminal offense against the petitioner.

When the trial court initially issues a CPO pursuant to D.C. Code § 16-1005(c), its finding, by a preponderance of the evidence, that the respondent has committed or threatened to commit a criminal offense functions as a determination that, if a CPO is not issued, there is a danger that the respondent will commit or threaten to commit a criminal offense against the petitioner. Injunctive relief in the form of a CPO for "up to one year," D.C. Code § 16-1005(d), may therefore be necessary to prevent the commission or threat of a criminal offense.

However, "[t]he Act does not authorize the issuance of permanent injunctions." *Cruz-Foster*, 597 A.2d at 929.[12] Instead, our statute expressly limits the duration of a CPO to one year, D.C. Code § 16-1005(d). Thus, when the trial court considers whether to extend an existing CPO, it cannot, as the dissent

---

[12] It may be more apt to say that the Act does not authorize the issuance of "indefinite" injunctions. While a preliminary injunction is issued before a determination on the merits, a permanent injunction is issued after a determination on the merits – and, although it is called "permanent," a permanent injunction may vary in duration and is not necessarily indefinite. *See, e.g.*, 43A C.J.S. *Injunctions* §§ 11, 15 (2020); 42 Am. Jur. 2d *Injunctions* §§ 9, 11 (2020).

suggests, simply rely upon the trial court's initial finding, in issuing the original CPO, that the respondent committed or threatened to commit a criminal offense. *Post* at 58-59 & n.16. This would amount to an end run around the statute's requirement that, to extend a CPO, good cause – a cognizable danger of a recurrent violation, D.C. Code § 16-1005(c), (d); *Cruz-Foster*, 597 A.2d at 930 – is necessary. The statute and our case law make clear that more is required to extend a CPO than just the findings supporting the original CPO. Otherwise, the original CPO is converted into a lifetime injunction renewable in one-year increments. Such an approach is contrary to the statute and would also fail to take account of relevant facts, such as subsequent developments and changes in circumstances that occur after the initial CPO is issued. Such subsequent developments are undoubtedly germane in assessing future danger and the need for additional extensions, which is presumably a significant reason for the statute's imposition of a one-year limit on the CPO. And, in light of the restraints on liberty that may flow from CPOs, see *infra* II.C.2, such a situation could present due process concerns, given that CPOs are civil injunctions and do not constitute criminal convictions of respondents.[13] Relatedly, indefinite CPOs, and their attendant

---

[13] *See, e.g.*, *Addington v. Texas*, 441 U.S. 418, 423-25 (1979) (noting that, "[i]n cases involving individual rights, whether criminal or civil, the standard of proof at a minimum reflects the value society places on individual liberty," and observing that, "[i]n a criminal case . . . the interests of the defendant are of such

(…continued)

constraints on respondents, could, arguably, also run afoul of one of the primary remedial purposes of the IntraFamily Offenses Act, which is to rehabilitate, rather than punish, offenders. See *supra* II.A & note 7. Accordingly, the trial court cannot, as the dissent urges, take an analytical shortcut by relying on the existence of the original CPO to extend the CPO at the request of a petitioner.[14] Rather, the trial court must make an independent determination, based on current and complete information – specifically, the entire mosaic of the case – that good cause exists to extend the CPO under § 16-1005(d).

Accordingly, the good cause determination under § 16-1005(d) requires the court to find, consistent with § 16-1005(c) and the injunctive nature of a CPO, as well as with *Cruz-Foster* and its progeny, that, if the CPO is not extended, there is a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year. *Cf.* 42 Am. Jur. 2d *Injunctions* § 34 ("Injunctive relief is warranted on a showing of threatened injury.

---

(…continued)
magnitude that," "under the Due Process Clause[,] . . . the state [must] prove the guilt of an accused beyond a reasonable doubt." (cleaned up)).

[14] Nor can the trial court start with a desired remedy for the petitioner (no matter how well-intentioned) without first establishing the legal predicate of "good cause" for the remedy.

To be entitled to an injunction, though, the plaintiff must establish that he or she has sustained or is immediately in danger of sustaining some certain and direct injury as a result of the challenged conduct. An injunction will not issue unless there is an imminent threat of illegal action. In other words, the injury or threat of injury must be real and immediate, not conjectural or hypothetical. The power to grant injunctive relief is not exercised to allay a mere apprehension of injury at an indefinite future time. The apprehension of injury must be well-grounded, which means that there is a reasonable probability that a real injury for which there is no adequate remedy at law will occur if the injunction is not granted." (footnotes omitted)); 43A C.J.S. *Injunctions* § 15 (An injunction "is an extraordinary remedy that is granted only when there is no other way to avoid irreparable harm to the plaintiff. The remedy is primarily to prevent future acts of harm. . . . The injunction remains in force only so long as the conditions that produce the injunction remain. . . ." (footnotes omitted)).

Our precedents provide that this good cause determination must take into account the entire mosaic of the case, which encompasses the full history of the parties' relationship and interactions – both before and after the original CPO was issued. *See Salvattera II*, 111 A.3d at 1037; *Robinson*, 886 A.2d at 86-87; *Tyree*, 728 A.2d at 106; *Cruz-Foster*, 597 A.2d at 930, 932; *see also Cruz-Foster*, 597

A.2d at 930 n.3 ("It is true that in this case, [the petitioner] seeks extension of an existing prior order rather than entry of a brand new one. We do not believe that this affects her burden, but the court must consider the entire history of her relationship with [the respondent], as reflected in the record, in determining whether [the petitioner] has presented evidence sufficient to warrant the relief sought."). In other words, the court should examine evidence of what occurred before the original CPO was issued, the nature of the criminal offense that served as the basis for the CPO, and what has occurred since the original CPO was issued and any subsequent extensions were granted, as the case may be. This last category is perhaps especially relevant, as it constitutes new information that was not previously available to the trial court in issuing or extending the CPO, and, given its recency, may be particularly probative of what is likely to occur in the coming year. It may include violations of the conditions of the CPO that would or did give rise to contempt proceedings, or, conversely, compliance with the conditions of the CPO; participation in treatment or rehabilitative programs, or lack thereof; changes in the residence or the occupational, financial, or personal status of the parties; and any other relevant circumstances or considerations. In short, the trial court must evaluate the total mix of information in determining whether there is a cognizable danger that the respondent will commit or threaten to

commit a criminal offense against the petitioner in the coming year.[15]

The IntraFamily Offenses Act, our case law, and the injunctive nature of CPOs make clear that "good cause" requires a finding of cognizable danger of future injury. While we share the dissent's sentiments and concern for victims of intrafamily and other offenses, the dissent's interpretation of the Act and of our case law cannot be squared with the language of the statute and the actual holdings of our precedents. The legislature must first amend the statute in order for the dissent's desired outcome to be reached here. Under the Act, the trial court may order remedial measures, rehabilitative or otherwise, once the requisite showing of a cognizable danger of future injury is made for injunctive relief in the form of a CPO. As with any injunctive relief, a petitioner's desire or request for a particular remedy, alone, does not satisfy his or her burden to demonstrate good cause, i.e., a risk of future injury. The benefit a petitioner may derive from a remedy,

---

[15] *Cf. Molloy v. Molloy*, 137 A.D.3d 47, 53 (N.Y. App. Div. 2016) ("Thus, in determining whether good cause [to extend a protective order] has been established, courts should consider, but are not limited by, the following factors: the nature of the relationship between the parties, taking into account their former relationship, the circumstances leading up to the entry of the initial order of protection, and the state of the relationship at the time of the request for an extension; the frequency of interaction between the parties; any subsequent instances of domestic violence or violations of the existing order of protection; and whether the current circumstances are such that concern for the safety and well-being of the petitioner is reasonable." (citation omitted)).

emotionally or otherwise, is certainly an important consideration and a positive outcome, but to reach the remedy, the legal predicate for the CPO must first be established. *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant.").[16] This is particularly so, given that the Act is designed to rehabilitate both petitioners *and* respondents. See *supra* II.A & note 7. Thus, to the extent that a petitioner seeks remedies where good cause for a CPO is lacking, the petitioner may pursue them in other ways. *Cf. Lyons*, 461 U.S. at 107 n.8 ("Of course, emotional upset is a relevant consideration in a damages action."). And, while a petitioner may continue to experience the emotional effects of a prior incident for years, the Act

---

[16] This court has not held, contrary to the dissent's assertions (well-meaning as they may be) that remediation of "emotional violence," without the necessary legal predicate – a finding of cognizable danger of future injury – establishes good cause. *Post* at 57 & n.10-11 (citing *Richardson*, 878 A.2d at 1217 n.6), 59 n.17 (citing *Holmon v. District of Columbia*, 202 A.3d 512, 522 (D.C. 2019)). In *Holmon*, we cited *Richardson* in support of our conclusion that a respondent who telephones a petitioner violates a CPO's no-contact provision even when the petitioner does not answer the phone – a holding that is not relevant here. *Holmon*, 202 A.3d at 522. In *Richardson*, we noted that stalking, which may be characterized as a form of "emotional violence," is a predicate criminal offense under the IntraFamily Offenses Act and may therefore serve as the basis for issuing a CPO, i.e. "good cause." *Richardson*, 878 A.2d at 1216-17 & n.6; see also *supra* note 8. Thus, *Richardson* confirms that committing or threatening a criminal offense constitutes good cause to issue a CPO – and is entirely consistent with our holding today that a cognizable danger of the commission or threat of a criminal offense constitutes good cause to extend a CPO.

expressly limits CPOs to one year unless the petitioner establishes good cause, i.e., cognizable danger of future injury. Thus, to the extent that petitioners, our dissenting colleague, or others seek to lengthen the duration of a CPO or modify the "good cause" legal predicate for the issuance or extension of a CPO, any effort to amend the language of the Act must be directed toward the Council. *See Kelly v. District of Columbia Dep't of Emp't Servs.*, 214 A.3d 996, 1011-12 (D.C. 2019) ("We do not pass upon the advisability of the scheme created by the statute, substitute our opinion for that of the Council, or seek to legislate in its place; rather, we take the D.C. Code as we find it.").[17]

Our articulation of the good cause standard is fully grounded in the Act and our precedents, which are binding on this division. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C. 1971).[18]

---

[17] This does not mean, as the dissent asserts, that CPOs can only be issued or extended "begrudgingly." *Post* at 64. It simply means that CPOs must be issued or extended consistent with the law.

[18] There is simply no merit to the dissent's assertions to the contrary. *Post* at 48-49, 58-59, 66-67, 69-70. Rather, what appears to be statutorily unmoored is the dissent's speculation regarding the meaning of "good cause" in § 16-1005(d) and its attempts to render § 16-1005(d)'s "good cause" requirement meaningless by asserting that the trial court can indefinitely extend a CPO based solely on the fact that the CPO was issued in the first instance, *id.* at 57-62 – an effort that we reject as inconsistent with the statute and our case law.

In sum, in considering a motion to extend a CPO, if the trial court determines, based on the entire mosaic and consistent with considerations discussed above, that the petitioner has demonstrated by a preponderance of the evidence that there is a cognizable danger that, in the absence of an extension of the CPO, the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year, good cause exists and it "may" extend the CPO. D.C. Code § 16-1005(d). If the trial court does not so determine, good cause does not exist and it may not extend the CPO.

## 2. *Balance of the Harms*

Once the trial court has found good cause and thereby satisfied the statutory threshold for extension, it must proceed to balance the potential harms to the parties in order to determine whether it will, in fact, extend the CPO – and, if so, what the scope and parameters of that extension will be.

As we have noted, "[a]n injunction is an extraordinary remedy," and, "[e]ven under a remedial statute directed at domestic violence, the judge is obliged to apply established equitable principles." *Tyree*, 728 A.2d at 106 (citing *Cruz-*

*Foster*, 597 A.2d at 931). Consistent with these principles, we have generally observed that, "[b]efore awarding injunctive relief, we must determine that *more* harm will result to the movant from the denial of the injunction than will result to the nonmoving party from its grant." *District of Columbia v. Greene*, 806 A.2d 216, 223 (D.C. 2002) (cleaned up). And with respect to the IntraFamily Offenses Act in particular, we have clarified that "a court must consider the 'balance of harms' between the petitioner and the respondent." *Salvattera II*, 111 A.3d at 1037 (quoting *Cruz-Foster*, 597 A.2d at 930).[19]

---

[19] *Cf.* Restatement (Second) of Torts § 941 (Am. Law. Inst. 2019 update) ("When a plaintiff proves that a tort has been committed or is threatened and shows that other remedies will not make him whole, an injunction is not to be issued as a matter of course. Elementary justice requires consideration of the hardship the defendant would be caused by an injunction as compared with the hardship the plaintiff would suffer if the injunction should be refused."); 42 Am. Jur. 2d *Injunctions* § 14 ("Even if facts justifying an injunction, such as success on the merits or irreparable injury, have been proven, a court must still exercise its discretion to decide whether to grant an injunction." (footnotes omitted)); *Id.* at § 38 ("An injunction is a potential remedy in any case in which it may provide significant benefits that are greater than its costs or disadvantages. The decision to issue injunctive relief is based on a balancing of hardships and conveniences, or equities. . . . [T]he harm suffered by the plaintiff in the absence of injunctive relief must outweigh the harm that the defendant would endure on the granting of the injunction. A court must weigh the benefits and burdens that granting or denying an injunction will have on the parties." (footnotes omitted)); 43A C.J.S. *Injunctions* § 88 ("The relief granted must be compatible with the equities of the case, in order to provide significant benefits that are greater than the costs or disadvantages. The court will balance the parties' relative hardships, conveniences, rights, oppression, injustice, harms, or injuries." (footnotes omitted)).

Our case law also supports the notion that a trial court considering a motion to extend a CPO should proceed to balance the harms only once it has found good cause, i.e., a cognizable danger of a recurrent violation – due in part to the fact that, as discussed above, if there is no appreciable danger of future injury, there is no basis for an injunction. In *Cruz-Foster*, we held that good cause for a CPO extension must be based on a cognizable danger of a recurrent violation, then stated: "Moreover, and especially in light of the remedial character of the Intrafamily Offenses Act, it is necessary to consider whether the 'balance of harms' favors the grant of [the petitioner's] application." *Cruz-Foster*, 597 A.2d at 930. In *Maldonado*, we concluded that there was a danger that the respondent would threaten or assault the petitioner if the CPO were not extended, then held: "In addition, we note that there are other factors that should be taken into account," and proceeded to evaluate the potential harms to the parties. *Maldonado*, 631 A.2d at 43-44. And, in *Robinson*, we considered the balance of the harms – and stated that safety may trump property rights – only after recognizing the trial court's finding that there was a potential for "tragic violence," i.e., a cognizable danger of a recurrent violation between the parties. *Robinson*, 886 A.2d at 86.

Accordingly, if the trial court has found that good cause exists to extend the CPO, it must then evaluate the harm to the petitioner that will occur if the CPO is

not extended and the harm to the respondent that will occur if the CPO is extended, and it must weigh these harms against one another. An extension is warranted if it determines that the potential harm to the petitioner outweighs the potential harm to the respondent.[20]

The balance-of-the-harms analysis may take into account several factors. Safety, and resulting peace of mind, are important concerns. Indeed, we have stated, in the context of balancing harms, that "a CPO is designed to protect [petitioners] from acts and threats of violence," and that a trial court should consider whether a respondent will "resum[e] . . . his prior assaultive conduct" and thereby "seriously harm[]" the petitioner. *Cruz-Foster*, 597 A.2d at 930. We have likewise noted that a CPO "serves as a potential deterrent [of future crimes] and provides a measure of peace of mind for those whose benefit it was issued." *Maldonado*, 631 A.2d at 44. Liberty interests are also relevant, as we have, in the past, observed that a CPO extension with a stay-away order "would do no more than require [the respondent] to obey the law and, in this case, to stay away from

---

[20] Under our existing statute and case law, a CPO issuance or extension cannot be solely based on the desire to provide a specific beneficial remedy to a petitioner, no matter how well-meaning. A CPO is a form of injunctive relief that may not be extended without "good cause," i.e., a cognizable danger that, in the absence of an extension, the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year. See *supra* II.C.1.

[the petitioner], which he was apparently ready to do in any event," meaning "his liberty will not be affected." *Cruz-Foster*, 597 A.2d at 930-31. We have similarly observed that "the stakes for [the respondent in a CPO action] were high," as the trial court's "contempt power" meant that a "violation of the order would . . . subject [him] to possible imprisonment, as well as to a fine," and that "other provisions of the CPO in this case significantly limited [his] freedom of action." *Tyree*, 728 A.2d at 104. In addition, we have recognized property interests, as well as the lesser weight to be accorded to them, as we have stated that the Act "allows safety concerns to trump property rights." *Robinson*, 886 A.2d at 86. We have also said that CPO provisions affecting children in common are "a factor that must be taken into account, along with others," and observed that the harm to a petitioner from not extending a CPO might have included the expiration of the child custody and child support provisions of the CPO. *Maldonado*, 631 A.2d at 43-44. And we have acknowledged social stigma, stating: "The people who come before this particular branch of the Family [Court] will be, if they are offenders, civil offenders. . . . We do not wish to stigmatize them. We want them to keep their earning capacity and also the possibility of self[-]respect and their connection with the family." *Harrison*, 461 F.2d at 1211 (citation and internal quotation marks omitted).[21]

---

[21] As one California Court of Appeal has elaborated:

(…continued)

Thus, in balancing the harms, the trial court should examine multiple factors, including, but not limited to, safety (and resulting peace of mind), restraints on liberty, restraints on property, family interests, social stigma, and other collateral consequences and relevant circumstances. We also emphasize that the trial court may accord different weight to different potential harms, analyzing the totality of the circumstances to balance the harms and exercising its discretion to fashion a CPO extension that is tailored to the situation of the parties.

If the trial court has determined, based on the balance of the harms, that it

---

(…continued)

> [The] "burdens" on the restrained party can be very real. There often will be some social stigma attached while a person is subject to a protective order. Existing employers may frown on an employee who is subject to such an order and prospective employers almost surely will. Thus the restrained party may lose out on a promotion or a job. The continued existence of such an order likewise may, fairly or unfairly, interfere with the restrained party's social life. Furthermore, where children are involved, a protective order designed to prohibit access to an abused spouse may have the collateral effect of limiting the restrained party's access to his (or her) children even when they are not potential targets of abuse.

*Ritchie v. Konrad*, 10 Cal. Rptr. 3d 387, 398-99 (Cal. Ct. App. 2004).

will extend the CPO, its balancing analysis will also inform its determination of the proper scope and parameters of the CPO extension, including duration and conditions of compliance. The trial court may extend a CPO for "up to one year," D.C. Code § 16-1005(d), and it may include in the CPO a variety of prohibitory and mandatory provisions that are designed to address the situation of the parties, § 16-1005(c)(1)-(12), including provisions geared to both "protect[ion]" and "rehabilitation." *Salvattera II*, 111 A.3d at 1034-35 (citations and internal quotation marks omitted); see also *supra* II.A.[22]

## III. Discussion

Because we have clarified the legal standard for extending a CPO, and because over two years have elapsed since Ms. Ramirez filed her motion to extend

---

[22] *Cf.* 42 Am. Jur. 2d *Injunctions* § 14 ("Courts also have discretion with respect to the scope of any injunction granted."); *id.* § 38 ("[T]his balancing of conveniences and inconveniences . . . calls for the exercise of sound judicial discretion in view of the circumstances. . . ."); 43A C.J.S. *Injunctions* § 16 (An "injunction should never be broader than is necessary to secure to the injured party relief warranted by the circumstances involved in the particular case. It should be narrowly tailored to fit the specific legal violation, and not impose any greater restriction or burden than is necessary to provide the protection sought. However, the court should not make the injunction so narrow that it invites easy evasion." (footnotes omitted)); *Id.* at § 88 ("[S]ince an injunction is an equitable remedy, a trial court weighs the respective conveniences and hardships of the parties and balances the equities.").

the CPO on December 1, 2017, we now vacate and remand so that the trial court may reconsider Ms. Ramirez's motion in light of this opinion and in light of the subsequent developments and the current circumstances of the parties.

On remand, the court should consider all relevant evidence in determining whether to extend the CPO. This includes the evidence adduced in connection with the issuance of the original CPO and subsequent CPO extensions, as well as evidence of what has occurred since the trial court held hearings on the December 1, 2017 motion and issued its March 20, 2018 order.[23]

The court may wish to hold additional hearings and consider additional evidence in order to obtain up-to-date information. *Cf. Robinson*, 886 A.2d at 87 ("Accordingly, we remand the case to the trial court so that it may re-evaluate the

---

[23] For instance, in a filing before the trial court, Mr. Salvattera alleged that, on February 19, 2018, following the close of hearings on Ms. Ramirez's December 1, 2017 motion to extend the CPO, Ms. Ramirez reported to the police that Mr. Salvattera was driving down Georgia Avenue NW in violation of the CPO; the police stopped Mr. Salvattera and advised him to stay away from the neighborhood. In addition, Ms. Ramirez has represented before this court that, since the most recent CPO hearings before the trial court, she has received approximately $57,000 in damages from the owner of the apartment building as a result of a successful wrongful eviction proceeding, though she is defending against a landlord/tenant suit alleging that she owes more than $20,000 in back rent.

situation of the parties, considering the entire mosaic of facts before it (including any developments since the entry of the last order).”); *Cruz-Foster*, 597 A.2d at 932 (vacating, remanding, and stating: “Since any CPO which may be entered will look to the future, the judge is of course authorized to conduct further proceedings to determine whether there have been any developments since she last heard the case which would affect [the petitioner’s] right to relief.”).

In vacating and remanding, we resolve the appeal. This court’s stay pending appeal of the expiration provisions of the March 20, 2018 CPO is therefore terminated. We direct the trial court, which now has jurisdiction over the case,[24] to instate an immediate temporary stay of the expiration provisions of the March 20, 2018 CPO extension pending its final resolution of the December 1, 2017 motion to extend.[25]

---

[24]  Mandate to issue forthwith.

[25]  We note that, in March 2019, while this appeal was pending, Ms. Ramirez filed, in the trial court, another motion to extend the CPO and a motion to stay consideration of that motion pending resolution of a “related appeal.” It appears that Ms. Ramirez was referring to this appeal, which was a direct appeal in the same matter, dealing with the same aspects of the case, meaning it would not have been proper for the trial court to resolve those motions while this appeal was pending – and the trial court rightly refrained from doing so. *See, e.g.*, *Stebbins v. Stebbins*, 673 A.2d 184, 189-90 (D.C. 1996). Today’s decision resolves the appeal, so the trial court may now address the March 2019 motions. However, the March 2019 motion to extend appears to be either premature or improperly filed.

(…continued)

## IV. Conclusion

In sum, we review a trial court's decision on a motion to extend a CPO for abuse of discretion. We will affirm the granting of an extension if the trial court determined by a preponderance of the evidence *first* that there was good cause to extend the CPO – defined as a finding, based upon the entire mosaic of the case, that there was a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year if the CPO is not extended – and *second* that the balance of the potential harms to each party merited an extension, the scope and parameters of which were informed by this balancing analysis. We will likewise affirm the denial of an extension if the trial

---

(…continued)

On remand, the trial court will reconsider its March 20, 2018 order, which was issued in response to Ms. Ramirez's December 1, 2017 motion to extend the CPO – an order which has remained in effect due to this court's stay pending appeal, and which will continue to remain in effect until the trial court's final resolution of the matter (pursuant to our direction to the trial court, described above). If the trial court decides, consistent with this opinion, to extend the CPO, Ms. Ramirez's March 2019 motion is premature, as she would not move to extend the CPO yet again until that time period draws to a close. If the trial court decides, consistent with this opinion, not to extend the CPO, then the CPO has expired and Ms. Ramirez cannot attempt to extend it, but must instead petition for a new CPO. Of course, Ms. Ramirez is free to submit the information and evidence that she included with her March 2019 motion, as well as any updated information and evidence, in additional filings or hearings ordered by the trial court on remand.

court determined by a preponderance of the evidence that there was no good cause to extend the CPO – defined as a finding, based upon the entire mosaic of the case, that there was no cognizable danger that the respondent will commit a criminal offense against the petitioner in the coming year if the CPO is not extended – or, in the alternative, that, even if there was good cause, the balance of the potential harms to each party did not merit an extension.

In light of the legal standard set forth above and the time that has elapsed since the motion on review was filed, we vacate the trial court's order and remand for further proceedings consistent with this opinion.

*So ordered.*

GLICKMAN, *Associate Judge*, dissenting in part and concurring in the judgment:  I concur in the opinion and judgment of my colleagues only insofar as they do not approve, and instead vacate, the trial court's denial of Ms. Ramirez's motion for a one-year extension of her Civil Protection Order against Mr. Salvattera.  In my view, for reasons I shall explain briefly, the trial court's ruling is indefensible and unjust.

I disagree with my colleagues' holding that "good cause" to extend a CPO "is defined as a cognizable danger that the respondent will commit or threaten to commit a criminal offense against the petitioner in the coming year if the CPO is not extended." *Ante* at 2.  Although the majority opinion does little to explicate the meaning of this cryptic "definition," it apparently is intended to require the petitioner to demonstrate (and the court to find) a likelihood, and not just a possibility, that the respondent will commit a future criminal offense against her.  See *ante* at 22-23.  This proof requirement is not found in the Intrafamily Offenses Act (IFA), it conflicts with the paramount remedial goals of that legislation, and it is not mandated by past decisions of this court.  It totally ignores the fact that the IFA provides for CPOs not only to prevent criminal violence and abuse, but also to remediate their lasting effects and rehabilitate the victim.  That means either of those goals may constitute good cause to extend a CPO.  As the facts of this case

demonstrate, the majority's definition of good cause, by eliminating the latter justification for extending a CPO, will serve only to frustrate the remedial goals of the IFA and jeopardize the recovery and wellbeing of victims of abuse.

## I.

Ms. Ramirez is the recovering victim of a sexual assault by Mr. Salvattera. In 2013, he was enamored of her and took advantage of his position as her resident building manager to surreptitiously photograph her and thereafter sexually abuse her when she became incapacitated in his apartment—there is evidence, and Ms. Ramirez believes, that he drugged her—while visiting him to discuss her precarious rent situation. Ms. Ramirez was traumatized by the attack.[1] On her

---

[1] The majority opinion notes that a SANE nurse found no physical injury or other forensic evidence of a sexual assault when Ms. Ramirez went to the hospital. *Ante* at 6. After Ms. Ramirez fled from Mr. Salvattera's apartment, she reported the sexual assault to her sister and two friends. She did not go to the hospital until the following day, however. Two experts in the medical examination of potential sexual assault victims, whom the trial judge fully credited, testified at the initial CPO hearing that absence of physical injury "is common" and "can be consistent with a sexual assault taking place." One expert added that only forty percent of sexual assault cases have actual medical evidence, though just two percent of the accusations are thought to be false. There was additional expert testimony that, because Ms. Ramirez waited a day before going to the hospital for an examination, it likely was too late to find evidence she had been drugged because any drugs in her system would have been metabolized.

behalf, the Superior Court issued a CPO in August 2014 requiring Mr. Salvattera to refrain from assaulting, threatening, or harassing Ms. Ramirez; to stay one hundred feet away from her; and to vacate the apartment building.

The latter requirement was necessary to implement the stay-away condition and protect Ms. Ramirez from further contact with Mr. Salvattera in and around the close quarters of her building—a building she could not enter or leave without passing right by the door to Mr. Salvattera's apartment. Mr. Salvattera refused to comply with the order to vacate, however, for some ten months, until this court upheld it on appeal.[2] In the interim, Ms. Ramirez could not bear to stay there while he was around, and she and her children were effectively homeless.

In subsequent years, up to the present proceeding, the Superior Court repeatedly found good cause to extend the CPO—including its requirement that Mr. Salvattera remain out of her building. That changed when the trial court ruled on Ms. Ramirez's most recent motion for an extension in 2018. This time, the judge concluded that, although Ms. Ramirez herself is "terrified" of Mr. Salvattera, there is no cognizable danger that he will abuse her again. The judge further

---

[2] *Salvattera v. Ramirez*, 111 A.3d 1032 (D.C. 2015).

concluded that, although Ms. Ramirez "will suffer irreparable harm if the injunction is denied, because she will be unable to live in the apartment building while Mr. Salvattera lives there without suffering serious emotional distress," that harm was outweighed by the harm to Mr. Salvattera from extending the CPO and preventing him from returning to the building. The judge therefore denied Ms. Ramirez's motion for a one-year extension of the CPO, and extended it for only three months to give Ms. Ramirez time to decide whether she would move herself and her family out of the building in which she had lived for some twenty years.

The majority opinion vacates the trial court's order and remands for de novo proceedings on whether there is good cause to extend the CPO, and it does not express or imply any approval of the court's rulings. I therefore think it unnecessary for me to address them in depth. But I will explain briefly why I think neither ruling is defensible or fair.

In concluding there is no "cognizable danger" that Mr. Salvattera will abuse Ms. Ramirez again if he resumes living in her building, the court relied heavily on its finding that he did not assault, threaten, or harass her when the CPO barred him from the building and her presence. That may be a good reason to maintain the bar

in effect; it is not much of a reason to lift it and allow him to come back.[3]  What we know for a fact is that when Mr. Salvattera was *not* barred from Ms. Ramirez's building, he took advantage of his position as building manager to sexually assault her.  In prior proceedings to extend the CPO, the trial court recognized that Mr. Salvattera's "past conduct of sexually abusing Ms. Ramirez is extremely troubling and does serve as a predictor of his probable future conduct."  Since then, Mr. Salvattera has vigorously resisted complying with the CPO's directive to live elsewhere away from her, and he persisted for years in trying to return, even to the point of arranging for a friend to live in his former apartment as, in effect, a place-holder for him.  Moreover, Mr. Salvattera plans to reassume his position as

---

[3]  As Justice Ginsburg memorably observed in her dissent in *Shelby County v. Holder*, ending a protective measure "when it has worked and is continuing to work . . . is like throwing away your umbrella in a rainstorm because you are not getting wet."  570 U.S. 529, 590 (2013) (Ginsburg, J., dissenting).  This analogy is particularly apt in the CPO context, as many abusers "closely monitor a protection order's expiration date and resume contact, harassment, stalking, or violence . . . upon the order's expiration."  Jane K. Stoever, *Enjoining Abuse: The Case for Indefinite Domestic Violence Protection Orders*, 67 VAND. L. REV. 1015, 1087-88 (2014); *see also id.* at 1024-26 (summarizing research showing that "past domestic violence is the best predictor of future abuse;" "domestic violence survivors face the greatest risk of acute violence and lethality during the actual separation from an abusive partner and the ensuing years;" and "continued abuse can happen over lengthy periods of time with prolonged gaps between incidents").  By suggesting that events during the year in which the CPO is in effect may be "particularly probative of what is likely to occur in the coming year," *ante* at 33, my colleagues invite, illogically, further future reliance on the cessation of harm as evidence that it will not recur.

building manager, which (notwithstanding his facially perplexing and unexplained testimony that someone else would be assigned responsibility for any maintenance work on Ms. Ramirez's apartment) would renew his power and authority over Ms. Ramirez and his ability to surveil her without her knowledge. His insistence on returning despite the effect it will have on her shows disregard for Ms. Ramirez's welfare and the anguish his presence will cause her to suffer. In my opinion, all this clearly adds up to establish a cognizable danger that Mr. Salvattera will sexually assault, threaten, or harass Ms. Ramirez again if given the chance; and I think any reasonable person in her position would fear it greatly. I fail to see any substantial evidence dispelling that danger or showing that Mr. Salvattera does not pose a continuing criminal threat to Ms. Ramirez's health and safety. It is no answer to say she can avoid the danger by fleeing the premises; the entire point of a CPO is to "safeguard [a victim's] safety and peace of mind,"[4] not to make things worse by putting the burden on the victim of abuse to disrupt her life to protect herself.

The trial court's "balance-of-harms" ruling also strikes me as—to put it bluntly—clearly out of balance. Because the judge was so confident Mr.

---

[4] *Robinson v. Robinson*, 886 A.2d 78, 87 (D.C. 2005).

Salvattera would not commit another offense against Ms. Ramirez, the judge's balancing entirely disregarded what I take to be a real and substantial risk of future criminal harassment. But even so, the judge fully credited Ms. Ramirez's testimony that every time she sees Mr. Salvattera, she begins to relive what he did to her, and the judge found that she "would suffer extreme emotional distress upon encountering" him in the future at her building. The judge concluded that the likely consequences of terminating the CPO for Ms. Ramirez—terror and mental distress so grave as to threaten her mental health and wellbeing and force her and her children to vacate their home of many years—amount to serious and irreparable injury. Extending the CPO would inflict no comparable harm on Mr. Salvattera. The record shows that Mr. Salvattera is both housed and self-employed, albeit not where and how he would like. Continuation of the CPO does no more than prevent him from returning to a rental apartment and a position as building manager that he has not occupied or held in years; it does not deprive him of any existing property interest or employment, nor does it prevent him from living and working anywhere else.[5]

---

[5] *Cf. Araya v. Keleta*, 31 A.3d 78, 81 (D.C. 2011) ("[T]he Intrafamily Offenses Act 'clearly envisions allowing safety concerns to trump property rights[,]' which serve 'as only one factor in the totality of circumstances.'" (citations omitted)).

In my view, it is not only inequitable, it is manifestly unjust to put a sexual assault victim to the choice of giving up her home or remaining to be re-traumatized by the renewed presence of the man who attacked her, merely to accommodate his personal interest in being able to live and work virtually by her side. I do not deny the adverse consequences to Mr. Salvattera of losing his apartment and job as building manager. The trial court found he has not had steady work and that his health problems have worsened due, in part, to his current living conditions. If those misfortunes can be alleviated without harming Ms. Ramirez, that would be desirable. But Mr. Salvattera's misfortunes are the consequences of his own wrongful actions and Ms. Ramirez's continuing mental distress over them. It is unjust to relieve him of those consequences at his victim's anguished expense.

## II.

The facts of this case dramatically demonstrate there may be compelling reasons to extend a CPO to protect a petitioner from serious harm other than the likelihood that the respondent will commit another crime against the petitioner. Those other reasons, displayed in this case, include protecting the petitioner from re-traumatization or the respondent's exacerbation of the original criminal injury,

and aiding her rehabilitation and recovery from its *sequelae*. As these other reasons are "consistent with the underlying [remedial] purpose of the Intrafamily Offenses Act,"[6] they may by themselves constitute "good cause" within the meaning of D.C. Code § 16-1005(d) for extending a CPO. The majority opinion advances no persuasive reason to hold otherwise.

The issue before us is one of statutory interpretation, and it is imperative to be clear about the policy of the IFA and the spirit in which we are obliged to construe it. This is legislation "designed to *counteract* the abuse and exploitation" of vulnerable people, typically (but not exclusively) "women and children."[7] Over the past four decades, the Council has progressively amended the Act to broaden its coverage and ensure that it provides "truly effective remedies" for those in need of them.[8] The IFA's protections now are equally available to victims of domestic violence and (as in the present case) to victims of stalking, sexual assault, or sexual

---

[6] *Murphy v. Okeke*, 951 A.2d 783, 789-90 (D.C. 2008).

[7] *Cruz-Foster v. Foster*, 597 A.2d 927, 931 (D.C. 1991) (emphasis added).

[8] D.C. Council, Comm. on the Judiciary, Report on the Intrafamily Offenses Amendment Act of 1982, Bill 4-195 at 10 (May 12, 1982) (hereinafter, "Judiciary Committee Report"); *see also Powell v. Powell*, 547 A.2d 973, 974 (D.C. 1988).

abuse committed outside the domestic context.[9]  Furthermore, "the statutory language excludes any notion that physical violence, or the threat thereof, [is] the only harm that the Act [is] designed to address."[10]  The Act also seeks to prevent *and remediate* the harms caused by "emotional violence,"[11] which an abuser may continue to inflict and exacerbate just by persisting in being an unwanted presence in his recovering victim's life.

Because "[t]he paramount consideration concerning this legislation is that it is remedial,"[12] and "the plain intent of the legislature was an expansive reading of the Act,"[13] we repeatedly have emphasized that "the Act must be liberally

---

[9]  *See* D.C. Code § 16-1001(12) ("'Petitioner' means any person who alleges, or for whom is alleged, that he or she is the victim of interpersonal, intimate partner, or intrafamily violence, stalking, sexual assault, or sexual abuse."); *A.R. v. F.C.*, 33 A.3d 403, 408 (D.C. 2011) ("[T]here now are two types of petitioners who may seek a civil protection order: alleged victims of 'interpersonal, intimate partner, or intrafamily violence' and alleged victims of 'stalking, sexual assault, or sexual abuse.'").

[10]  *Richardson v. Easterling*, 878 A.2d 1212, 1217 n.6 (D.C. 2005).

[11]  *Id.* (quoting Judiciary Committee Report at 1).

[12]  *Cruz-Foster*, 597 A.2d at 929 (citation omitted).

[13]  *Powell*, 547 A.2d at 974.

construed in furtherance of its remedial purpose."[14] This court therefore has understood that "we may not read into the Act limitations or restrictions which it does not contain."[15]

Guided by these settled principles in interpreting the "good cause" requirement of § 16-1005(d), we must reject the majority's definition of the term, for that definition would import into the IFA by judicial fiat a restriction on the availability of CPOs that would frustrate rather than further the remedial purposes of the Act. On its face, the IFA nowhere requires a CPO petitioner to show, or the court to find, a "cognizable danger" (or indeed, any degree of likelihood) that the respondent will commit *another* crime against her. This is a potentially burdensome additional proof requirement to impose on (usually disadvantaged and pro se) victims of past abuse. The IFA conditions the initial issuance of a CPO only on a finding of a *past* intrafamily offense. While that almost always does raise the specter of possible future offenses, the statute does not burden petitioners with a separate requirement to prove their likelihood to the satisfaction of the trier

---

[14] *Cruz-Foster*, 597 A.2d at 929; *see also, e.g.*, *Maldonado v. Maldonado*, 631 A.2d 40, 42 (D.C. 1993) ("The Intrafamily Offenses Act is a remedial statute and as such should be liberally construed for the benefit of the class it is intended to protect.").

[15] *Richardson*, 878 A.2d at 1217.

of fact in order to receive the protections of a CPO. D.C. Code § 16-1005(c) does not require the court to make that determination for a CPO to issue, and § 16-1005(d) does not purport to require it for a CPO to be extended.[16]

A clear and compelling reason the IFA does not condition the issuance or extension of CPOs on proof of future dangerousness in all cases is that CPOs are meant not just to protect petitioners from future violence and abuse, but also to serve critically important rehabilitative goals, like mitigating the injurious emotional and other effects of past abuse and helping petitioners to recover from them.[17] To accomplish their multiple purposes, "[t]rial courts are granted broad

---

[16] The majority opinion effectively concedes this point when it states that the statutorily required finding of a *past* criminal offense "functions as a determination" that there is a cognizable danger the respondent will commit another criminal offense against the petitioner if the CPO is not issued. *Ante* at 29. If the inquiries thus collapse into one, and the finding of a past crime equates to a finding of cognizable future dangerousness, the majority opinion fails to explain why this "functional" equivalency it perceives does not apply when the petitioner requests that the CPO be extended.

[17] *See, e.g.*, *Holmon v. District of Columbia*, 202 A.3d 512, 522 (D.C. 2019) ("A CPO is designed to, among other things, protect a petitioner from emotional violence, *see Richardson v. Easterling*, 878 A.2d 1212, 1217 n.6 (D.C. 2005), and provide the petitioner 'a measure of peace of mind,' *Maldonado v. Maldonado*, 631 A.2d 40, 43 (D.C. 1993)."); *Robinson*, 886 A.2d at 87 ("an important factor in issuing a CPO is that it 'provides a measure of peace of mind for those for whose benefit it was issued'") (quoting *Maldonado*); *Salvattera*, 111 A.3d at 1038 (same); *see also* Stoever, at 1043, 1064-65 & n.271, 1066-67 & nn.285-86 (describing the CPO as a "survivor-initiated remedy [that] was intended to be autonomy

(…continued)

discretion when implementing the remedial measures of the Intrafamily Offenses Act"[18] and may order the respondent to perform or refrain from a wide range of actions "as may be appropriate to the effective resolution of the matter."[19]  That resolution is not necessarily accomplished just because the respondent is unlikely to commit another crime against the petitioner.

---

(…continued)
enhancing" and collecting research regarding the mental health benefits of CPOs for petitioners); Caroline Vaile Wright & Dawn M. Johnson, *Encouraging Legal Help Seeking for Victims of Intimate Partner Violence:  The Therapeutic Effects of the Civil Protection Order*, 25 J. TRAUMA STRESS 675, 675-81 (2012) (comparing PTSD and depressive symptomology of intimate partner violence victims who obtained a CPO and those who did not, finding that victims who obtained a CPO experienced greater reductions of both types of symptoms, and noting prior research showing that civil legal interventions for victims correlated with improvements in mental health); Judith A. Smith, *Battered Non-Wives and Unequal Protection-Order Coverage: A Call for Reform*, 23 YALE L. & POL'Y REV. 93, 120-21 (2005) (recognizing that the "comprehensive" remedies available to petitioners seeking CPOs give victims of sexual abuse or intimate partner violence "control over what happens to [them]" and that "this type of empowerment affects a victim's sense of well-being"); Ilene Seidman & Susan Vickers, *The Second Wave:  An Agenda for the Next Thirty Years of Rape Law Reform*, 38 SUFFOLK U. L. REV. 467, 473, 476-78 (2005) (identifying civil protective orders as one of eight "core areas of civil legal needs that affect the well-being and recovery of rape victims").

[18]  *Araya*, 31 A.3d at 81 n.5.

[19]  D.C. Code § 16-1005(c)(11).

Since a CPO may be designed not only to prevent the respondent from committing future offenses, but also to remediate the ill effects on the petitioner of the respondent's past offenses, it would be quite contrary to the "paramount consideration" of the Act's construction—and patently illogical—to interpret "good cause" for the extension of a CPO as always requiring a finding of a danger that the respondent will commit a future offense. Such a condition would thwart the remedial purposes of the Act, because even if an extension is not needed to deter the respondent from committing a future offense against the petitioner, there still may be strong reasons to extend the CPO to require the respondent to fulfill other conditions of the CPO and continue fostering, rather than impeding, the petitioner's ongoing rehabilitation.

Unsurprisingly, the majority's definition of "good cause" is also textually inapt. "Statutory language must be read in context and a phrase gathers meaning from the words around it."[20] Section 16-1005(d) states that the court may "extend, rescind, or modify the order for good cause shown." Thus, the term "good cause" must be given a broad enough definition that it can apply to rescinding and modifying a CPO as well as extending it. But requiring "a cognizable danger that

---

[20] *Jones v. United States*, 527 U.S. 373, 389 (1999) (internal quotation marks omitted).

the respondent will commit or threaten to commit a criminal offense against the petitioner" is only a particular possible application of the term "good cause" to a CPO extension; the term cannot possibly have the same meaning or require the same showing for rescissions and modifications of CPOs. In applying the same term to all three actions, the Council must have had something more general in mind – namely, giving the parties and the court the power and flexibility, in accord with the purposes of the Act, to seek remedies appropriate to their needs, both deterrent and rehabilitative.

And this view of the term "good cause," unlike the majority's limiting definition, comports with the common understanding that the term "generally signifies a sound basis or legitimate need to take judicial action."[21] Because the term by itself is somewhat indefinite, where it is used in a statute it is interpreted

---

[21] *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987); *Jacobs v. Jacobs*, 167 A.D.3d 890, 890 (N.Y. App. Div. 2018); *see also Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "good cause" as "a legally sufficient reason"); *Safeway Stores, Inc. v. Reynolds*, 176 F.2d 476, 477 (D.C. Cir. 1949) (Good cause shown is "not an idle phrase without significance . . . [it] contemplates an exercise of judgment by the court, not a mere automatic granting of the motion. The Court's judgment is to be moved by a demonstration by the moving party of its need[.]") (citations and quotations omitted).

"in context by considering the statute as a whole."[22] "In a statutory context" it is "focused on real, albeit sometimes difficult to discern, legal standards: the *legislature's* view of what is 'good,' 'sufficient,' or 'reasonable.'"[23] In this case, the legislature's view is *not* difficult to discern. It is plain, and in the past this court has recognized that it is plain. The relief provided under the Act is "unambiguously" intended to be not just deterrent, but also "remedial" to "counteract," not merely prevent, "abuse and exploitation."[24]

Nor are general equitable principles governing injunctions of the kind enunciated in *W.T. Grant*, or in the majority opinion, *ante* at 31-32, necessarily apropos merely because CPOs are injunctive in nature. The CPO is a creature of statute. Once a legislature adopts a statutory framework for an injunction, the standard for its issuance is a matter of statutory interpretation and not only of general equitable principles.[25] This court recognized this principle in *Cruz-Foster*

---

[22] *MacPherson v. Weiner*, 959 A.2d 206, 210 (N.H. 2008) (interpreting the meaning of "good cause" to extend a protective order).

[23] *State v. Johnson*, 116 P.3d 879, 888 (Or. 2005) (emphasis in original).

[24] *Cruz-Foster*, 597 A.2d at 931.

[25] *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193-94 (1978); Dobbs' Law of Remedies § 2.10 (2d. Ed 1993) ("The statute remains the best beginning
(…continued)

when it stated that, while under general equitable principles, "injunctive relief is to be granted sparingly," that is not the case under the IFA; rather, we said, because the Act "was designed to counteract the abuse and exploitation of women and children," and "[g]iven the Council's unambiguously stated preference for a generous construction of the remedial provisions of the Act," judges must award injunctive relief under the Act according to "the spirit of the law and not begrudgingly."[26]

It follows that once a petitioner has satisfied the standard for the issuance of a CPO, she does not need to show a danger that the respondent will commit another crime against her to be entitled to an extension of the CPO based on a showing that its remedial measures are still warranted to protect her from other harms attributable to the respondent and to ensure her wellbeing. And no case of this court has held or implied otherwise; contrary to the majority opinion, we have never held that a "cognizable danger of a recurrent violation" by the respondent is the only danger sufficient to establish good cause to extend a CPO.

---

(…continued)
place for identifying the rights and the permissible range of discretion in administering remedies.").

[26] *Cruz-Foster*, 597 A.2d at 931 (quotation marks and citations omitted).

*Cruz-Foster* is the only case involving the IFA in which the "cognizable danger" language even appears. There it was part of a quoted passage from the Supreme Court's opinion in *United States v. W.T. Grant Co.* stating the general equitable standard for issuing injunctions that serve the purpose of prohibiting defendants from violating the law (which in *W.T. Grant* was the antitrust prohibition against interlocking directorates).[27] But *Cruz-Foster* did not hold that the "cognizable danger of a recurrent violation" standard applies whenever a petitioner seeks to extend a CPO, regardless of its purposes; nor did the court cite *W.T. Grant* for such a sweeping proposition. Neither *W.T. Grant* nor *Cruz-Foster* considered whether the recurrent violation standard applies when a petitioner requests injunctive relief for the purpose of requiring a respondent to mitigate, remedy, or refrain from exacerbating a past criminal violation (as distinct from the purpose of prohibiting future law violations). This question simply was not presented or decided in *Cruz-Foster*.[28]

---

[27] *See Cruz-Foster*, 597 A.2d at 930 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

[28] The question was not presented in *Cruz-Foster* because Ms. Cruz-Foster *was* seeking continued protection from the respondent's threatened violence; she was not trying to justify extension of the CPO on an alternative, remedial ground.

Ms. Cruz-Foster's appeal presented the distinctly different question of how to allocate the burden of proof—whether the burden is on the petitioner to show good cause for extending a CPO, or on the respondent to show good cause for letting the CPO expire. On that issue, the court cited *W.T. Grant* for its holding that the burden is on the moving party to show the need for an injunction. Adhering to that principle, the court held that an extension of a CPO is an award of injunctive relief beyond that originally ordered, and the petitioner therefore bears the burden of showing good cause for an extension of a CPO by a preponderance of the evidence.[29] This was not a holding as to the meaning of "good cause" for all CPO extensions.

As the author of the opinion in *Cruz-Foster* warned in another decision of this court, "[t]he rule of *stare decisis* is never properly invoked unless in the decision put forward as precedent the judicial mind has been applied to and passed upon the precise question."[30] *Cruz-Foster* therefore cannot be read as precedent supporting the majority's restrictive and textually-unmoored limitation of "good

---

[29] *See id.*

[30] *Murphy v. McCloud*, 650 A.2d 202, 205 (D.C. 1994).

cause" to only one specific harm the IFA was intended to address, a recurrent criminal offense against the petitioner.

*Cruz-Foster* also held that, in addition to (1) assessing whether the petitioner has shown a need for extending a CPO consistent with the purposes of the IFA in light of the totality of the circumstances (the "entire mosaic"), (2) "it is necessary to consider whether the 'balance of harms' favors the grant of [the petitioner's] application."[31]   Our later cases addressing CPO extensions, *Maldonado v. Maldonado* and *Robinson v. Robinson*, followed *Cruz-Foster*'s teaching and engaged in that analysis.  Neither case required a showing of a cognizable danger (or any likelihood) that the respondent would commit another criminal offense against the petitioner if the CPO extension were denied.  In fact, neither case even mentioned a "cognizable danger of a recurrent violation" test.

*Maldonado* is particularly instructive with respect to the question now before us.  In that case, we concluded the trial court had abused its discretion by denying an extension of a CPO against the petitioner's husband solely because he was incarcerated and unlikely to be a danger to her.  In so holding, we did not

---

[31] *Cruz-Foster*, 597 A.2d at 930.

apply a cognizable danger or comparable test based on the likelihood of a recurrent criminal offense—in fact, we did not dispute the unlikelihood of such a recurrence while the husband was in prison and pointed out only that his incarceration did not "necessarily" or with "certainty" eliminate the "possibility" that he somehow still could find ways to threaten or harass the petitioner.[32]   Rather, we said that the husband's incarceration could "not be the sole determina[nt] as to whether the CPO should or should not be extended."[33]   We explained that the original CPO addressed other factors besides the petitioner's safety from her husband; notably, it gave the petitioner custody of the children and ordered the husband to make child support payments.  In deciding whether to extend the CPO, we held, the judge was required to consider how its expiration would affect the children's custody and support, not just the petitioner's safety.  Each was "a factor that must be taken into account, along with others, in making that determination [whether the CPO should

---

[32]   *Maldonado*, 631 A.2d at 42-43; *see also id.* at 45 (Schwelb, J., concurring) (doubting that the "hypothetical" possibilities posited by the majority, such as Mr. Maldonado's escape from prison, would be sufficient to warrant extension of the CPO).  The majority opinion misreads our opinion in *Maldonado* when it states, *ante* at 25-26, that we held the trial court "abused its discretion in finding . . . no cognizable danger of a recurrent violation."  *Cruz-Foster* made it clear that a "cognizable danger" is "more than the mere possibility" of a recurrent violation.  597 A.2d at 930 (quoting *W.T. Grant*, 345 U.S. at 633).  "More than the mere possibility" was not shown in *Maldonado*.

[33]   *Id.* at 42.

be extended]."[34]   In short, *Maldonado* demonstrates that a judge does not necessarily need to find a "cognizable danger of a recurrent violation" to grant a petitioner's request for an extension of a CPO because the request may be justified in light of the other harms the CPO was meant to avert (and the "balance of harms" that also must be considered).[35]

In sum, the majority's new judge-created rule that a court cannot extend a CPO unless the petitioner shows she needs it for protection from further criminal abuse is objectionable for the following principal reasons:  (1) the rule ignores the serious non-criminal harms that may result from the expiration of a CPO—harms that the IFA is meant to forestall and redress, including (as this case illustrates) the deprivation and undoing of specific relief ordered by the CPO and the re-

---

[34] *Id.* at 44.

[35] *Robinson* is not on point at all, and thus lends no support to the majority holding in this case.  There was no issue in *Robinson* about whether extension of a CPO *depended on* a finding of a danger of future violence.  There was such a finding in that case; that it did or could support the extension requested in that case does not mean such a finding always must be made to support an extension of a CPO.  Thus we did not, as the majority contends, hold, "in essence, . . . that the trial court had properly found a cognizable danger of a recurrent violation and therefore good cause to extend the CPO." *Ante* at 27.  Rather, we held that the court had not properly weighed the petitioner's safety concerns against the respondent's property rights when the court refused to prevent the respondent from occupying a residence next door to the petitioner.  886 A.2d at 86-87.  This was a "balance-of-harms" question.

traumatization of the petitioner by future unwanted close and continuing contact with her abuser; (2) the rule has no grounding in either the text or the legislative policy of the IFA, and instead conflicts with the IFA's "good cause" standard and thwarts its "paramount" remedial purposes; and (3) the rule is not required by, and in fact is inconsistent with, this court's caselaw. I certainly agree that, in order to obtain an extension of a CPO over the respondent's objection, a petitioner must show a legitimate need for it—a danger that some harm, of the sort the IFA is designed to prevent or alleviate, will result if the CPO is allowed to expire. The danger of a recurrence of criminal abuse is one such harm, of course. But it is not the only such harm, and I see no justification for ignoring that fact and thereby jeopardizing the wellbeing of abused and vulnerable petitioners.

The majority opinion does not advance any persuasive rationale in justification. The majority seems to think this court's past guidance has left trial judges unable to exercise their discretion appropriately in considering whether good cause exists to extend a CPO. If that is what my colleagues believe, they have not substantiated it, and I rather think that such a view gives too little credit to our cases and the capability of our trial judges. In point of fact, cases like *Cruz-Foster*, *Maldonado*, and *Robinson* have furnished considerable guidance and a framework in which judges are directed to make their determinations of good

cause—instructing judges, for example, that the burden is on the petitioner to show a valid need for extension of the CPO's benefits and protections by a preponderance of the evidence; that the judge must balance the harm to the petitioner from allowing the CPO to expire against the harm to the respondent from extending it; that a court must consider the totality of the circumstances (the "entire mosaic"), and in particular the history of the case and the respondent's past conduct (which "is important evidence – perhaps the most important – in predicting his probable future conduct"[36]); that in addition to deterring respondents from physically injuring and harassing petitioners, CPOs serve the "important purpose" of affording petitioners "peace of mind" and alleviating their emotional distress; that safety concerns trump property rights; that courts may not read limitations or restrictions into the IFA that it does not expressly contain; and so on. The framework, constructed over decades, does not lack for rigor; it is sufficient to guide judges to extend CPOs only when the petitioner shows that continued prevention or remediation is warranted and fair, and it is far from the slippery slope the majority inexplicably seems to fear, in which "the original CPO is converted into a lifetime injunction renewable in one-year increments" based only on

---

[36] *Cruz-Foster*, 597 A.2d at 930.

evidence of the initial offense. *Ante* at 30.[37] Throughout the law, we entrust judges to exercise their discretion under "good cause" standards that are far less concrete and developed; and, of course, with the IFA the legislature "unambiguously" intended judges to exercise their discretion to give "a generous construction of the remedial provisions of the Act."[38]

But even assuming more guidance might be desirable to enable trial judges to perform their duties when deliberating whether to extend CPOs, the court today gives the wrong guidance. There is simply no warrant for so limiting the definition of "good cause" that *only* a cognizable danger of a recurrent criminal offense can establish it. This is a harmful and illogical development that will burden and jeopardize those in need of the IFA's protections.

I respectfully dissent.

---

[37] The majority does not cite a single instance of such an automatic renewal or any case in which a CPO extension raised a due process concern—the present case is certainly not one of them—and I am unaware of any case fitting that description.

[38] *Cruz-Foster*, 597 A.2d at 931.